<hr />

2014 VT 5

**In re Chaves A250 Permit Reconsider and Chaves Londonderry Gravel Pit A250 Permit (Kraig and Doreena Hart, Appellants)**

[93 A.3d 69]

No. 13-069

Present: **Reiber, C.J., Skoglund, Burgess and Robinson, JJ.**

Opinion Filed January 17, 2014

*Hans G. Huessy* and *Damien J. Leonard* of *Murphy Sullivan Kronk*, Burlington, for Appellants.

*Amy Clarise Ashworth* and *Nathan H. Stearns* of *Hershenson, Carter, Scott & McGee, P.C.*, Norwich, for Appellees.

¶ 1. **Reiber, C.J.** Neighbors Kraig and Doreena Hart appeal an Environmental Division order granting an Act 250 permit to applicants Chaves Londonderry Gravel Pit, LLC and its principal David Chaves for operation of a sand and gravel quarry. Neighbors argue that: (1) modifications made to the project prior to trial were substantial enough to require a remand to the district commission or a continuance of the trial; (2) the court erred in concluding that the noise from the project would not have an undue adverse aesthetic impact; (3) the court erred in finding that the project did not impact any historic sites and that the project complied with the regional and town plans; and (4) the court imposed an unenforceable restriction in condition 16 related to noise levels. We affirm, but remand for clarification of condition 16.

¶ 2. Applicants' sand and gravel pit is located along the eastern border of Route 100 in the town of Londonderry. Neighbors own a country inn on property that lies across Route 100 from the operation. The project site has been historically used for sand and gravel extraction for at least fifty years. Applicants purchased the property and began extracting sand, rock and gravel from the site

in 1997. At the time, no land-use permits covered the extraction operations. Applicants operated under the assumption that their activities on a preexisting quarry were grandfathered and required no state land use approval. The local environmental commission issued a jurisdictional opinion, finding that the scope of applicants' operation amounted to a substantial change from the preexisting operation and therefore a permit was required. Applicants appealed this determination to the Environmental Division.

¶ 3. Meanwhile, applicants also applied for an Act 250 permit. The district environmental commission ultimately approved the application subject to several conditions. Applicants disputed some of the conditions, and appealed to the Environmental Division. Several parties entered appearances and filed cross-appeals. Neighbors entered an appearance in the Environmental Division as interested parties, but did not file a cross-appeal.

¶ 4. The jurisdictional and permit appeals were coordinated for purposes of pretrial discovery, motion practice and trial. Trial was set for March 5, 2012. On February 21, 2012, applicants filed a motion to adopt a settlement agreement, which was reached with several of the parties. The terms of the settlement agreement contained proposed changes to the project, including: changing the access point to the quarry from a proposed new entrance at the south of the quarry to an existing access road at the north end of the quarry; changing the loading area and a related berm for noise mitigation; adding noise mitigation berms; limiting the maximum number of truck trips per day; restricting the days and weeks when drilling, blasting and crushing may occur; and establishing a blasting plan.

¶ 5. On February 28, 2012, neighbors filed an objection to applicants' motion to adopt the settlement agreement, and filed a motion to continue the trial. Neighbors argued that they lacked sufficient time to adequately prepare for trial and that the proposed settlement agreement made material changes to the project that required a remand to the district commission for consideration in the first instance. In particular, neighbors argued that the change in location of the access point to the quarry was a material change that would negatively impact their property. The trial was reset for March 13, 2012.[1]

---

[1] On February 28, 2012, neighbors filed two motions to continue the trial. First, they sought a continuance based on a serious illness of neighbor Kraig Hart's

¶ 6. On March 9, 2012, the trial court denied neighbors' motion for a remand. The court acknowledged neighbors' contention that they were unfairly disadvantaged in particular by applicants' decision to change the access point. The court ruled, however, that the changes were not substantial enough to change the character of the project, and that a remand was not necessary. The court noted that in reviewing a proposed Act 250 project, it was required to consider "all reasonable alternatives to the proposed project, with the limits of not changing the very essence of the project." Because the parties were obligated to be prepared to address differing proposals, the court found no basis to delay the trial and denied the motion for a further continuance.

¶ 7. Prior to trial, the court informed the parties that it would reserve judgment on the motion to accept the settlement agreement until trial. The court explained that it would make "its own independent determinations as to the appropriate weight and credibility to be assigned to all trial evidence."

¶ 8. At trial, applicants presented testimony from several different experts related to the project's blasting plan, impact on traffic and noise creation. At the beginning of the hearing, neighbors objected generally to the admission of any expert evidence relating to changes made as a result of the settlement agreement, arguing that they were provided with an insufficient opportunity to investigate or evaluate the experts' opinions on how the changed entry point would impact the project. Consistent with its pretrial ruling, the court overruled the objection and allowed the experts to testify.

¶ 9. Neighbors were the only parties to appear and oppose the project at trial. Neighbors cross-examined applicants' experts and neighbor Doreena Hart testified, but neighbors did not present experts of their own.

¶ 10. The court issued a lengthy written order. As to the jurisdictional appeal, the court affirmed the district commission, holding that applicants' operations increased the manner and intensity of the preexisting operation and therefore required an Act 250 permit. As to the merits appeal, the court noted that its review was limited to addressing the questions raised by appli-

mother. Second, they requested a postponement of the trial based on applicants' proposal to relocate the project's access point. The court granted the first motion, postponing the trial to March 13, 2012, but denied the second motion.

cants, which related to four criteria and subcriteria: criterion 5 relating to traffic impacts, criterion 8 concerning aesthetic impacts, criterion 9(E) about extraction of earth resources, environmental impacts and site rehabilitation, and criterion 10 about conformity with the town and regional plans. The court found that with appropriate conditions the project conformed to all of the criteria, and a permit should be issued. Neighbors filed a timely notice of appeal.

I.

¶ 11. ■ We first address neighbors' procedural arguments. On appeal, neighbors argue that the modifications to the project made as part of the settlement were substantial and required a remand to the district commission or, at the very least, a continuance. The Environmental Division has authority to "affirm, reverse, or modify the decision of the tribunal appealed from, may remand the case for further proceedings consistent with the order of the court, and may expressly set forth conditions and restrictions with which the parties must comply." V.R.E.C.P. 5(j). Thus, the Environmental Division may change a proposal without remand as long as the revisions do not amount to "truly substantial changes to the form or type of an application." *In re Sisters & Bros. Inv. Grp., LLP*, 2009 VT 58, ¶ 21, 186 Vt. 103, 978 A.2d 448.

¶ 12. Neighbors argue that the changes were so significant that a remand to the district commission was required. Neighbors liken the situation to that in *In re Torres*, 154 Vt. 233, 236-37, 575 A.2d 193, 195 (1990), wherein this Court held that the superior court in a de novo appeal did not have authority to consider an application for conditional use approval where the application filed with the town zoning board was one for a permitted use. The decision explained that the superior court's power on appeal was as. broad as that of the zoning board, but not broader. *Id.* at 235, 575 A.2d at 195. Because there would not be the appropriate public notice, the zoning board could not convert a permitted use application hearing into one on conditional use. Therefore, the superior court could not do so on appeal, and a remand was required. *Id.* at 236-37, 575 A.2d at 195. The changes proposed by applicants in this case are not similar to those in *Torres*. There was no attempt in this case to materially alter the proposal or change the type of permit requested.

¶ 13. The changes here are much more akin to those made in *Sisters & Brothers*, 2009 VT 58, ¶¶ 19-21, which did not require a

remand. In *Sisters & Brothers*, the applicant submitted a revised site plan and an opponent to the project argued that that the changes were material and substantial enough to require a remand. This Court affirmed the environmental court's finding that the changes were not so material as to require a remand since there was no change in the form or type of the application. *Id.* ¶ 21.

¶ 14. ■ Here, the proposed changes similarly did not require a remand. The revisions proposed in the settlement did not change the nature of the permit requested, alter the location of the project, or increase the scope of the project. In fact, several of the changes involved mitigating efforts to reduce the noise and traffic impacts of the project and to limit the time for operations. Neighbors point particularly to applicants' decision to change the access point from a proposed location to the south of neighbors' property to an existing access point north of neighbors' property. Relying on evidence provided by applicants' expert, neighbors argue that this change will significantly increase the traffic in front of their inn. Thus, neighbors contend that the change in access alone dramatically increased the project's impact on them.

¶ 15. The court was still within its discretion to deny the motion for remand. That the changed entry point may now impact neighbors more particularly does not amount to a substantial change in the project itself. The question is whether the scope of the project has been substantially changed or the nature of the permit has changed. Here, the changes did not reach the magnitude of a substantial change.

¶ 16. ■ ■ Moreover, it would be poor policy to require a remand in situations such as this. Applicants are encouraged to resolve differences with interested parties by amending a project to respond to issues, and it would be extremely inefficient if each concession required a remand to the district commission. As we explained in *Sisters & Brothers*, "If applicants were barred from presenting minor revisions to the Environmental Court in response to concerns expressed by interested parties, site-plan review would become a procedural ping-pong match: any change would result in a remand for municipal consideration, followed by another appeal to the Environmental Court." *Id.* ¶ 21. The Environmental Division has discretion to modify a proposal or to remand the case. See *id.* ¶ 12 (citing V.R.E.C.P. 5(j) and explaining

that environmental court has discretion in deciding whether to remand case). The court did not abuse that discretion in denying neighbors' request for a remand in this case.

¶ 17. In a related argument, neighbors contend that at the very least the changes were significant enough to require postponement of the trial. Neighbors claim that if they had known earlier that the access point would be relocated then they would have engaged experts or developed evidence related to their concerns about increased noise, dust and traffic. According to neighbors, they first received the study regarding the traffic and noise "at or shortly before the trial," and this denied them a meaningful opportunity to engage in discovery.

¶ 18. The Environmental Division has discretion in addressing motions to continue, and we will reverse only if the discretion is "exercised upon grounds clearly untenable, or to an extent clearly unreasonable." *In re Woodstock Cmty. Trust & Housing Vt. PRD*, 2012 VT 87, ¶ 36, 192 Vt. 474, 60 A.3d 686 (quotation omitted). Here, the court denied neighbors' request to delay the trial, explaining that from the outset neighbors were required to be prepared to consider all reasonable alternatives to the proposed project, and therefore a proposed change in location of the access road did not require a delay of the trial.

¶ 19. Neighbors' request for a continuance rests mainly on their assertion that they were not informed in a timely manner of applicants' intent to move the access point for the quarry. According to neighbors, they first learned of this change at or shortly before trial, preventing them from adequately researching the impact of the change. The record reveals that neighbors received notice of applicants' proposal to move the access location to the quarry prior to trial. The docket entry pertaining to the February 13, 2012 status conference indicates that a settlement agreement was circulating amongst the parties at that time, and had not been approved by neighbors. Thus, neighbors were aware at that time or earlier of applicants' proposal to move the access point.[2] Certainly, however, neighbors knew of the proposed change by around February 21, 2012 when applicants filed a motion to adopt the settlement agreement, and served a copy of it on

---

[2] On appeal, applicants' attorney represents that the proposal was sent to neighbors' attorney on February 8, 2012. Because we are confined to the record submitted to the trial court, we do not consider this fact.

neighbors. That was three weeks before the trial began on March 13, 2012. Furthermore, as the trial court explained in its denial of the continuance, neighbors were aware all along that the project could be modified.

¶ 20. ■ Given neighbors' prior knowledge of the proposal, the court did not abuse its discretion in denying a continuance. Although the original proposal called for a new entry point at the south end of the project, neighbors were aware that the historic entry point was to the north. In fact, that entrance had been actively used during excavations following Hurricane Irene. Further, neighbors were involved in the settlement negotiations and, at least by the time that the settlement was filed with the court, noticed of the changed entry point in advance of trial. Although now neighbors claim that they would have engaged an expert had they known of the change in entry point, nothing in the record suggests that neighbors sought the advice of an expert even after they became aware of the settlement proposal.

¶ 21. ■ Neighbors also argue that a continuance was necessary because they did not have advance notice of changes in the reports completed by applicants' experts concerning the project's noise and traffic impacts. The court acted within its discretion in denying neighbors' motion to further continue the trial based on the amended expert reports. See *State v. Schreiner*, 2007 VT 138, ¶ 14, 183 Vt. 42, 944 A.2d 250 ("Because a motion to continue must be decided in the light of the circumstances surrounding each individual case, we will not interfere with the trial court's decision if there is a reasonable basis to support it."). Although neighbors did not receive the amended reports of applicants' experts, for some time neighbors had access to the original reports created by applicants' experts because those reports were submitted to the district commission. At trial, applicants introduced the experts' amended reports, which showed how the data would change if the terms of the settlement were imposed. As explained above, although neighbors did not have the modified reports, they were noticed of the settlement and the changes in the proposal. Furthermore, neighbors did not make a discovery request for reports from applicants' experts. See V.R.E.C.P. 5(a)(2) (rules of civil procedure applicable to Act 250 appeals in environmental court); V.R.C.P. 26(b)(4)(A)(iii) (allowing party to obtain report of expert through request for production or subpoena). Given that

there was no formal request for the expert reports and neighbors had prior notification of the changes, the court did not err in denying their motion to continue.

## II.

¶ 22. Next, we turn to neighbors' arguments concerning whether the project complied with all of the Act 250 criteria. Before an Act 250 permit may be granted, the applicant must demonstrate that the statutory criteria are satisfied. 10 V.S.A. § 6086(a) (listing ten criteria). In applicants' appeal to the Environmental Division, applicants' statement of questions raised issues concerning four of the Act 250 criteria.[3] These were criterion 5 regarding traffic impacts, criterion 8 related to the aesthetic impact of the project, criterion 9(E) concerning extraction of resources, and criterion 10 regarding conformance with the town and regional plans. On appeal to this Court, neighbors challenge the environmental court's findings related to the project's aesthetic impact, and compliance with the town and regional plans. We apply a deferential standard of review to decisions of the Environmental Division and will not reverse its factual findings unless they are clearly erroneous. *In re Rinkers, Inc.*, 2011 VT 78, ¶ 8, 190 Vt. 567, 27 A.3d 334 (mem.). The Environmental Division's legal conclusions regarding compliance with Act 250 criteria will be upheld when the findings reasonably support those conclusions. *Id.*

## A.

¶ 23. First, neighbors argue that the Environmental Division erred in concluding that the project conformed to criterion 8 of Act 250. This criterion requires that the project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). The party opposing a project based on criterion 8 has the burden of demonstrating that the project will have an adverse impact. *Id.* § 6088(b). The two-pronged *Quechee* test is used for determining whether an Act 250 application complies with criterion 8. *In re Rinkers*, 2011 VT 78, ¶ 9

---

[3] As explained previously, the issues before the Environmental Division were limited to the statement of questions filed by applicants because neighbors did not cross-appeal or file a statement of questions. At the beginning of the hearing, the court clarified with applicants those issues from their original statement of questions that they intended to pursue.

(endorsing use of the *Quechee* test). "[A] determination must first be made as to whether a project will have an adverse impact on aesthetics and the scenic and natural beauty of an area because it would not be in harmony with its surroundings." *In re Halnon,* 174 Vt. 514, 515, 811 A.2d 161, 163 (2002) (mem.). If the factfinder concludes that the project will have an adverse impact, "the inquiry then advances to the second prong to determine if the adverse impact would be 'undue.' " *Id.* To assess if an impact is undue, the court considers whether the project: violates clear, written community standards on preservation of aesthetics or natural beauty; offends the sensibilities of the average person; or contains reasonable mitigating measures to improve the project's harmony with its surroundings. *In re Eastview at Middlebury, Inc.,* 2009 VT 98, ¶ 20, 187 Vt. 208, 992 A.2d 1014.

¶ 24. The Environmental Division properly applied the *Quechee* test in this case. At the outset, the court noted that there was no suggestion that the project would interfere with the area's scenic or natural beauty. The aspect of aesthetics at issue was the noise created by the quarry operation itself and the associated traffic. To analyze the impact of the noise, the court began by identifying the baseline, and found that the area was characterized by rural properties as well as several commercial operations, and that the area already contained significant background noise created by the traffic on Route 100.

¶ 25. With this background in mind, the court found that "the additional truck traffic the Project generates will not have an adverse discernible impact on [the surrounding] neighborhood, since the neighborhood is already subject to noises from traffic on Route 100." The court found, however, that the drilling, blasting and crushing noises from the quarry would be adverse, and went on to analyze whether the impact was undue. The court found that there was no undue impact because the project was in keeping with community standards, would not offend the sensibilities of the average person, and contained mitigating steps such as berms and limits on operation that improved the harmony of the project with the surroundings.

¶ 26. On appeal, neighbors argue that the court erred in concluding that the noise from truck traffic associated with the project would not have an adverse impact on the aesthetics of the area. It is important to emphasize that although neighbors' arguments regarding noise focus on the traffic that will be created

by the project, neighbors do not challenge the court's finding that the project conforms to criterion 5 in that it does "not cause unreasonable congestion or unsafe conditions" on area highways. 10 V.S.A. § 6086(a)(5). The court's findings on the amount of traffic created by the project are important, however, because they impact neighbors' arguments on noise.

¶ 27. As revised under the settlement, the project has a limit of 75 loads per day, or 150 truck trips. There is also a limit on the amount of material that can be extracted. Applicants' expert testified that given the extraction limits, on average there would be 32 one-way truck trips per day, 24 of which would travel past neighbors' inn. The trial court recognized that there could be a maximum of 75 loads per day, but also credited applicants' expert that it was more likely that on average an additional 24 one-way trips would travel past neighbors' inn. The court found that this would represent an increase of less than one percent in the overall amount of daily traffic and about a ten percent increase in the average number of daily truck trips.

¶ 28. On appeal, neighbors argue that the court erred in looking at the average number of trips rather than the maximum amount of truck traffic. There was no error. The court considered both the maximum amount of traffic and the average. The court recognized that there could be a maximum of 75 loads, or 150 trips, but credited applicants' expert that if this level of operation were maintained, the project would operate on only forty-eight days, given the limit on extraction. The court also found applicants' expert credible in explaining that it was more likely that extraction and traffic would be spread across an operation season and that on average there would be 24 additional truck trips passing by neighbors' inn.

¶ 29. The court's finding that under either scenario there would be no adverse impact on noise levels is supported by credible evidence produced at trial. Applicants' traffic expert testified that of the maximum 150 truck trips 75% of the traffic would travel in the direction past the inn, amounting to approximately 112 truck trips. Applicants' noise expert testified that even 120 additional truck trips would not cause a significant sound impact because "when compared to the existing truck load on the roadway [the traffic increase] would produce an increase in sound level of less than three decibels." Neighbors offered conflicting evidence, opining that an additional 100 truck trips per day would result in a big impact.

¶ 30. ■ ■ It was up to the court, however, to assess the evidence, and discern the credibility of the witnesses. *In re McShinsky*, 153 Vt. 586, 589-90, 572 A.2d 916, 919-20 (1990) (explaining that trier of fact has discretion to resolve conflicting evidence and evidence will not be reweighed or reassessed on appeal). Given that the undisputed evidence indicates that significant traffic already exists on Route 100, it was not an abuse of discretion for the court to credit applicants' expert and find that the added traffic would not be adverse as it was in keeping with the existing character of the area. See *Halnon*, 174 Vt. at 515, 811 A.2d at 163 (reciting that first part of *Quechee* test is to determine if project will have adverse impact on existing scenic and natural beauty of area "because it would not be in harmony with its surroundings"). Because the findings are supported, neighbors have demonstrated no reason for reversal. *Eastview at Middlebury*, 2009 VT 98, ¶ 23 (affirming court's findings where there is *"any* credible evidence" supporting them even when contrary evidence exists).

¶ 31. Neighbors also raise arguments regarding the amount of noise that will be created by the individual trucks entering and exiting the project. Neighbors argue that applicants' evidence shows that accelerating trucks will increase the noise level over the stated maximum of 55 dBA.[4] Neighbors also contend that the Environmental Division failed to consider the type of noise created by the increased traffic, in particular, the uniquely disruptive noise of trucks braking, shifting and accelerating.

¶ 32. Neighbors bore the burden of demonstrating that the project would have an undue adverse aesthetic impact due to noise, and the court did not abuse its discretion in finding that

---

[4] Applicants' expert report explains that the monitoring was done by measuring sound levels on the scale detectable to the human ear, reported in decibels (dB) on a weighted "A" scale, which is the scale most frequently used for environmental noise analysis. The decibel scale is logarithmic so that for every 10 dB increase, loudness appears to double, and small changes are generally not perceptible. Further, if two equal sound sources are added together, the resulting sound level is not the sum of the two, but just 3 dB higher. The report also explains that the State of Vermont does not have a quantitative noise standard, but the report employed a standard used by the former Environmental Board of 55 dBA Lmax at homes and areas of frequent human use. See, e.g., *In re Barre Granite Quarries, LLC*, No. 739, slip op. at 81 (Vt. Envtl. Bd. Dec. 8, 2000) (applying 55 dBA Lmax standard to homes and areas frequented by people), http://www.nrb.state.vt.us/lup/decisions/2000/7c1079-rev-eb-fco.pdf.

this burden was not met. As to the 55 dBA level, the court credited applicants' expert and found that most of the activities at the project will generate noise of less than 55 dBA at nearby residences and areas of frequent human use. Neighbors contend this finding is in error because applicants' expert conceded that a truck accelerating past neighbors' inn would produce a sound level of 69 dBA.

¶ 33. This statement does not undermine the court's overall finding that noise levels would generally remain under 55 dBA and that the noise was not adverse to the area's aesthetics. Although the expert testified that a truck accelerating from the quarry would produce a sound level of 69 dBA, the expert also explained that existing noise from a passing truck creates a sound level of 68 dBA. The expert explained that this 1 dBA difference does not amount to a significant difference in the sound heard. From this evidence, the court found that in those instances where the noise exceeded the 55 dBA standard, "the Project noises will be no louder than the discernible noises from the Route 100 traffic and activities on surrounding properties." Essentially, even though applicants' experts testified that in some instances the noise from trucks leaving the quarry could exceed 55 dBA, the character of the area already included significant traffic noise at or near the level of those exceedances and therefore a slight increase in the traffic noise would not amount to an adverse impact. Further, the experts' testimony is unclear about whether the 69 dBA is a measurement at the property line or at a residence or area of frequent human use. Other testimony[5] supports the court's general finding that noise levels are unlikely to be in excess of 55 dBA at locations off of applicants' property, particularly residences. Therefore, there was no error.

¶ 34. Neighbors also argue that the court failed to consider the character of the noise created by the project. At trial, neighbors agreed that the vehicle noise from Route 100 was louder than noise from the quarry, but testified that it was less disruptive because it was a steady stream instead of intermittent. To the

---

[5] Applicants' expert testified that according to their modeling, the noise level at residences and areas of frequent human use does not exceed the 55 dBA standard. Further, with sound mitigation in place, noise will not exceed 55 dBA at neighbors' property. The expert also testified that any noise from trucks leaving the quarry would not substantially exceed the existing levels from traffic already passing by on Route 100.

extent neighbors are claiming that the *traffic* noise from the quarry is different in character than the existing traffic noise, as explained above, the court did not err in accepting applicants' expert's opinion that the traffic noise from the quarry was consistent with the already existing noise from Route 100.

¶ 35. Neighbor Doreena Hart's testimony appears also to claim that the blasting and drilling operation created unique noises inconsistent with the character of the area. That claim is, however, consistent with the court's findings. The court found that the quarry noise was adverse to the surrounding area, but went on to find that the impact was not undue. On appeal, neighbors have not pointed to any error in the court's analysis of whether the impact was undue.

### B.

¶ 36. Related to criterion 8, neighbors argue that the Environmental Division found that no historic sites would be impacted by the project, and this was contrary to the evidence. At trial, neighbor Doreena Hart testified that neighbors' inn is on the register of historic places. Neighbors contend that it is therefore uncontested that a historic site would be impacted, and the court erred in failing to analyze whether the project would have an adverse impact on the inn as a historic site.

¶ 37. ▮▮ Neighbors misconstrue the court's findings. The court did not find that historic sites would not be impacted by the project, but simply noted that it had not "receive[d] any evidence that historic sites or rare or irreplaceable natural areas are located on the Property or in the surrounding areas." This statement is entirely accurate. Certainly, neighbor Doreena Hart testified that their inn was on the list of historic places, but even assuming that the inn qualified as a historic site for Act 250 purposes, neighbors did not present any evidence as to how the inn would be specifically impacted as a historic site, beyond the general impact on the inn discussed above. It was neighbors' burden to demonstrate that a historic site was impacted and that any conditions imposed by the permit were inadequate to protect the site. Neighbors failed to present any evidence on this point. Therefore, the court did not err in finding that there was no evidence of an adverse impact on any historic site.

## C.

¶ 38. ▮▮▮ Neighbors argue that the court erred in determining that the project complied with the local and regional town plans. Under criterion 10, a project must conform with any local or regional plan. 10 V.S.A. § 6086(a)(10). The burden of proving compliance rests on the applicants. *Id.* § 6088(a). A project only conflicts with a plan when the plan's standards are "stated in language that is clear and unqualified, and creates no ambiguity." *In re John A. Russell Corp.*, 2003 VT 93, ¶ 16, 176 Vt. 520, 838 A.2d 906 (mem.) (quotation omitted). In contrast, "[b]road policy statements phrased as nonregulatory abstractions" are not equivalent to enforceable restrictions. *Id.* We accord deference to the trial court's finding of conformity. See *id.* ¶ 17 (applying deferential standard of review to finding regarding conformity).

¶ 39. The court found that the town and regional plans did not contain language that expressed clear and unambiguous standards that would restrict applicants' project. To the contrary, the court noted that both the town and regional plans express general policies on earth and mineral resources and reference the importance of those resources. Further, the regional plan identifies the area of the project as one appropriate for this use. The court noted that "[t]here was no evidence presented at trial of standards within the Regional Plan that specifically prohibit the proposed project, and our own review revealed no such standards."

¶ 40. On appeal, neighbors argue that the regional and town plans use mandatory language regarding minimizing impacts on historical sites. They point to three particular parts of the Londonderry Town Plan. First, the purpose of the rural residential-3 district, where the project is located, is to "provide for agriculture, forestry, low-density residential development and other compatible land uses in a manner that maintains the Town's rural character, scenic landscape and natural resources." Second, a stated policy in the scenic areas section is to "[m]aintain natural and man-made features that are of local scenic, cultural and historic significance and protect them from activities that impair their integrity, character and/or quality." Third, under cultural and historic resources, the town's policy is to "[p]rotect places of outstanding cultural, aesthetic, archeological, natural and/or historical value from development that impairs their character and quality." In addition, they rely on language in the Windham

Regional Plan, which specifies that mineral extraction should "minimize[ ] adverse effects on aesthetics . . . and special community resources (such as historic sites . . . )," and should not "interfere with or have negative impacts on . . . historic sites." Essentially, neighbors argue that the project will create noise that is industrial in nature, which will conflict with and impair the historic character of the inn, and this is in contravention of policies in the town and regional plans.

¶ 41. The court did not err in concluding that none of the language highlighted by neighbors creates a specific policy prohibiting a project such as applicants' in this geographic area. The language relied on by neighbors is broad and nonregulatory, espousing general policies about maintaining features, protecting valuable areas, and minimizing impacts, but contains no specific requirements that are legally enforceable. See *In re JAM Golf, LLC*, 2008 VT 110, ¶¶ 13-14, 185 Vt. 201, 969 A.2d 47 (holding that ordinance which required design to "protect" natural resources was unconstitutionally vague because it created no real standard).

¶ 42. In addition, the language relied on by neighbors does not express unambiguous standards in that both the town and regional plans also express other goals. The town plan references earth and mineral operations/earth extraction operations, and recognizes the importance of those resources. The regional plan also identifies the area as one of significant sand and gravel resources and identifies the area as one suitable for extraction operations. Therefore, while preservation of historic sites is important, the plans also recognize the importance of quarrying. The zoning regulations resolve any ambiguity in the plans' intent by specifically allowing quarries as a conditional use in the district where the project is located. See *In re Molgano*, 163 Vt. 25, 30, 653 A.2d 772, 775 (1994) ("Zoning bylaws are more than strong indications of legislative intent in determining the meaning of an ambiguous town plan; they are the specific implementation of the plan."). Because there are no enforceable standards to restrict the project, the court properly concluded that the project conforms to both the town and regional plans.

### III.

¶ 43. Finally, neighbors argue that the court imposed an unenforceable restriction in imposing permit condition 16 concerning the project's noise impact. In relevant part, condition 16 reads:

The maximum noise levels from operations on the site, including trucking, but excluding trucks accessing and egressing the site at its juncture at Route 100 and excluding blasting noise, shall not exceed 55 dBA (Lmax) at any existing residences or areas of frequent human use as found by the District Commission in its March 4, 2011 decision. It is understood and agreed that if the existing access is improved and utilized as the sole access, that truck traffic entering and exiting the project site may, in combination with existing Route 100 road noise, cause periodic exceedances of the 55 dBA (Lmax) standard on limited portions of the properties to the north and west of the existing access driveway. In no event, however, may these noise levels on any portions of the properties to the north and west of the existing access driveway be greater than the noise levels which have existed in these locations for the period beginning in 2005 and ending on December 31, 2011.

¶ 44. Neighbors contend that the portion of condition 16 prohibiting noise from exceeding levels which have existed on the property "for the period beginning in 2005 and ending on December 31, 2011" is wholly unenforceable because the noise levels during that time frame fluctuated dramatically. During that time period, the quarry experienced a time of inactivity, a time of operation without a permit, and a time of high-volume extraction in response to Hurricane Irene.

¶ 45. An Act 250 permit may contain conditions that are an "allowable proper exercise of the police power." 10 V.S.A. § 6086(c). These conditions must be "reasonable." *Eastview at Middlebury*, 2009 VT 98, ¶ 14. Neighbors contend that since the noise levels changed over the indicated time frame, the condition fails to set a discernible standard for comparison. Applicants respond that there is sufficient clarity to give notice of the limitations.

¶ 46. ■ We agree that the condition prohibiting noise from exceeding levels attained from 2005 to December 2011 is vague. There are no definite, qualitative or quantitative standards attached to the condition. Cf. *In re Robinson*, 156 Vt. 199, 201-02, 591 A.2d 61, 62 (1991) (holding that condition which contained definite requirements was not vague). Although it appears that the Environmental Division was simply seeking to ensure that noise

would not increase beyond what had previously been experienced, the standard fails to provide sufficient clarity as to what noise level is acceptable. Therefore, on remand, the court is directed to revise this condition so that it contains a definite standard.

*Affirmed; remanded for the Environmental Division to clarify condition No. 16.*