2014 VT 101

### In re All Metals Recycling, Inc. (DRB Permit Appeal)

[107 A.3d 895]

No. 13-455

Present: **Reiber, C.J., Skoglund, Robinson and Crawford, JJ.,**[1] **and Zonay, Supr. J., Specially Assigned**

Opinion Filed August 14, 2014

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Hobart F. Popick* and *James T. DeWeese* of *Langrock Sperry & Wool, LLP*, Burlington, for Appellants.

*Paul S. Gillies* of *Tarrant, Gillies, Merriman & Richardson*, Montpelier, for Appellee Town of Williston.

*Robert F. O'Neill* and *David A. Boyd* of *Gravel & Shea PC*, Burlington, for Appellee All Metals Recycling, Inc.

¶ 1. **Skoglund, J.** Thirteen Town of Williston residents appeal from the Superior Court, Environmental Division's grant of a discretionary permit to All Metals Recycling, Inc., to establish an outdoor storage area and install a scale and scale house. The discretionary permit allows applicant to continue operating a previously unpermitted scrap-metals recycling business in Williston. The permit proposes no physical changes to any buildings on the premises, as applicant has already constructed the scale and scale house which the permit will authorize. Residents argue that (1) applicant's business is not a permitted use under Williston's Unified Development Bylaws; (2) the environmental court erred in not remanding the application for further review by the Town's Development Review Board (DRB) when applicant submitted a new parking plan several weeks before trial; and (3) applicant's proposed parking plan does not conform to the Bylaws. We affirm.

¶ 2. For several years, applicant has operated a scrap-metals recycling facility at 38-42 Dorset Lane in Williston. Applicant's business consists of purchasing, sorting, and recycling metals that are either brought to the facility by customers, or collected directly from customers and trucked to the facility by applicant. Customers bringing materials to the facility are required to separate scrap metals from garbage and nonrecyclable materials prior to applicant's acceptance of the metals. Applicant does not accept garbage at the Williston facility. Materials collected offsite from customers are trucked in, and the trucks are weighed, unloaded, and weighed again. After collection and weighing, applicant then sorts, shears, crushes, and compacts the metals using a variety of industrial equipment, and ships them for resale to mills, processors, and refineries.

¶ 3. The facility is located in Williston's Gateway Zoning District North (GZDN). ReSOURCE: A Nonprofit Community Enterprise, Inc. leases the property from the owner, Riggs Properties. In turn, applicant subleases approximately 463 square feet of indoor office space as well as extensive exterior space from ReSOURCE. Prior to construction of the scale and scale house, the owner of Riggs Properties informed applicant that the area in which the scale and scale house would be placed was part of applicant's sublease. However, it was later determined that the scale and scale house were located on a small portion of land belonging to the Town.

¶ 4. Residents, including a concerned business competitor, sent a letter to the Town's Zoning Administrator expressing concerns regarding applicant's business. Residents questioned applicant's lack of a permit, and whether applicant's activities were a permitted use within the GZDN under the Bylaws. These concerns were brought to applicant's attention, and soon after, applicant submitted a discretionary permit application to the Administrator. After a public notice and hearing, the DRB approved the discretionary permit with several conditions, including that applicant obtain a lease from the Town for use of the land containing the scale and scale house. In May 2012, applicant satisfied this condition. Residents then appealed to the environmental court.

¶ 5. The environmental court swiftly disposed of a series of cross-motions for summary judgment, concluding that applicant's proposed use was permitted in the GZDN under the Bylaws. The court denied summary judgment on the sufficiency of proposed off-street parking, however, concluding that applicant lacked a plan clearly marking out locations of individual parking spaces. In response, applicant submitted an additional parking layout plan, clarifying the number and location of parking spaces around the premises. The environmental court denied residents' motion in limine to exclude the additional plan from trial. The court reviewed the parking plan de novo at trial and granted the discretionary permit, holding that, with the addition of a bicycle parking space, applicant's parking met all Bylaw requirements. Residents now appeal to this Court.[2]

---

[2] The Town participated in both the trial and appeal, and generally agrees with applicant on points of fact and matters of law.

¶ 6. We first address residents' contention that the environmental court erred in granting applicant's motion for summary judgment on the issue of whether applicant's proposed operation is a permitted use under the Bylaws. We review motions for summary judgment de novo, applying the same standard of review as the trial court. *In re Miller Subdiv. Final Plan*, 2008 VT 74, ¶ 8, 184 Vt. 188, 955 A.2d 1200. If there is no genuine issue of material fact, summary judgment will be granted where the moving party is entitled to judgment as a matter of law. *Id.*; see also V.R.C.P. 56(a). The nonmoving party will receive the benefit of all reasonable doubts and inferences. *Miller*, 2008 VT 74, ¶ 8.

¶ 7. In setting forth the permitted uses within each zoning district, the Town relies on the North American Industrial Classification System (NAICS), which the Bylaws define as an "all-inclusive hierarchical system for describing economic activities." Because the Bylaws expressly rely on NAICS definitions for categories and subcategories of permissible business activities, we likewise refer to these NAICS definitions to determine whether applicant's use is permitted.

¶ 8. Under the Bylaws, the GZDN "offers ·a location for a continuing diverse mix of light industrial, commercial, and office uses." Among the list of NAICS categories permitted to operate in the GZDN are "Waste Management and Remediation Services." The NAICS definition for waste management and remediation services "includes establishments . . . operating materials recovery facilities (i.e., those that sort recyclable materials from the trash stream)." NAICS code 562 (2007), https://www.census.gov/eos/www/naics/index.html. "Materials Recovery Facilities" is, in turn, a NAICS-defined subcategory of "Waste Management and Remediation Services" and refers to "establishments primarily engaged in (1) operating facilities for separating and sorting recyclable materials from nonhazardous waste streams (i.e., garbage) and/or (2) operating facilities where commingled recyclable materials, such as paper, plastics, used beverage cans, and metals, are sorted into distinct categories." *Id.* at 562920.

¶ 9. ■ "[Z]oning bylaws are interpreted according to the general rules of statutory construction." *In re Champlain Oil Co. Conditional Use Application*, 2014 VT 19, ¶ 7, 196 Vt. 29, 93 A.3d 139. Our objective in statutory interpretation is to construe and effectuate the legislative intent behind a statute. *In re Carroll*,

2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990. "We will enforce the plain meaning of the statutory language where the Legislature's intent is evident from it," but where not evident from the plain meaning, we will construe intent from consideration of "the whole statute, the subject matter, its effects and consequences, and the reason and spirit of the law." *Id.* (quotation omitted). Thus, where an operation satisfies the plain meaning of the NAICS definitions provided in the Bylaws for a given district, it is a permitted use within that district.

¶ 10. The environmental court concluded that applicant satisfied the definition of "Materials Recovery Facilities" and was thus permitted to operate in the GZDN. Residents argue that applicant cannot satisfy the NAICS definition for either the waste management and remediation category or the materials recovery facility subcategory because applicant does not accept actual garbage, thereby failing to remove materials directly from the "trash" or "waste stream" as residents claim the NAICS definitions require. We are not convinced.

¶ 11. The NAICS definition for materials recovery facilities requires that an enterprise separate materials from waste streams *or* sort commingled recyclable materials into distinct categories. NAICS 562920, *supra*. Applicant's business involves taking a variety of recyclable metals, likely to otherwise land in the garbage dump, and sorting them into categories based on crushable weight or type of metal, such as aluminum and copper or ferrous versus nonferrous. Residents do not dispute that applicant is engaged in purchasing, transporting, sorting and processing recyclable scrap-metal materials, and the environmental court found that applicant "sorts and aggregates the metals it purchases." Sorting and aggregating are the two components required under the second prong of the materials recovery facility definition.

¶ 12. ▌ In maintaining that applicant cannot meet the requirements of either a waste management and remediation service or a materials recovery facility because it does not remove recyclables from the trash or waste streams, residents' argument ignores the "and/or" language in the NAICS definition. Regardless of whether applicant removes recyclables from the trash stream, it does take commingled recyclable materials — of which "metals" is expressly included — and sorts them into categories. Thus, based on the plain language of the NAICS definition, we hold that the

facility's activities satisfy the description of a materials recovery facility and, consequently, are an acceptable type of waste management and remediation service to operate in the GZDN. Because we hold that applicant meets the second prong of the materials recovery facility definition, we do not need to reach residents' contention that "trash stream" is an industry term of art from which applicant does not remove recyclables.

¶ 13. ■ ■ Although residents urge that the Bylaws' definitions be read strictly, to do so would be contrary to their intent. The Bylaws, through NAICS, do not and cannot exhaustively define each iteration of possible business practices; rather, they provide examples of activities which are used to categorize businesses as neatly as possible. See *In re Laberge Moto-Cross Track*, 2011 VT 1, ¶ 14, 189 Vt. 578, 15 A.3d 590 (mem.) ("[W]e have recognized that [zoning] regulations cannot be considered to be entirely exhaustive, given the breadth of novel land-development possibilities a municipal body may face."). Applicant's business meets the plain language definition of a materials recovery facility, and is thus a permissible use under the Bylaws.

¶ 14. We also reject residents' contention that applicant's business is an "industrial" use and therefore not within the scope of GZDN's "light industrial" zoning. Applicant uses several machines including shears, saws, and a compactor to break down and aggregate like-metals into shippable form for resale. Residents characterize these activities as "heavy industrial" operations, which are at odds with the GZDN's "light industrial" permitted uses, but do not offer any substantive distinction between the two that is grounded in the Bylaws. The Bylaws do not define the term "industrial," or offer any difference between "industrial" and "light industrial" uses. "Heavy industrial" uses are nowhere mentioned. What the Bylaws do state is that the GZDN is zoned for a "mix of light industrial, commercial, and office uses," which applicant — with its small office space, commercial purpose, and limited use of machinery — meets. Applicant does not propose a large factory or processing plant, or another use which could be characterized as a "heavy industrial" one. Using some metal-processing machines for part of applicant's business does not render the entire business a heavy-industrial use.

¶ 15. Residents further contend that because the Bylaws include other, industrially-oriented districts, they intend to exclude indus-

trial uses from the GZDN. Residents point out that there are two other zoning districts, the Industrial Zoning District East (IZDE), and the Industrial Zoning District West (IZDW), each permitting a variety of industrial uses. Residents take the presence of these two zoning districts as proof positive that applicant has set up shop on the wrong side of town, claiming that because these districts are intended for a broader variety of industrial enterprises, applicant's business is appropriate for those districts but not permitted in the GZDN. We disagree.

¶ 16. The IZDE, according to the Bylaws, "is intended to accommodate computer and electronic equipment manufacturing, solid waste disposal, and utilities," specifically permitting an IBM plant and landfills. The IZDW similarly allows "a variety of industrial and some commercial uses." The descriptions of each zoning district are dispositive of nothing about the GZDN. They only show that there are multiple locations in the Town of Williston to develop an industrial business, not that applicant is precluded from operating in a particular one. We note that all three districts allow NAICS category 562, waste management and remediation services. Pointing out minor differences between these other districts and the GZDN only highlights that there is no clear distinction in the Bylaws between "industrial" and "light industrial" uses that might prohibit applicant's operation. What the Bylaws do include is the NAICS definition for a materials recovery facility. Because we have concluded that applicant's use constitutes a materials recovery facility — a permitted use in the GZDN — and because the GZDN's purpose is to permit light industrial uses, we hold that applicant's materials recovery facility constitutes a light industrial use and is therefore permitted.[3] The environmental court did not err in granting summary judgment on this issue in applicant's favor.

¶ 17. Next we address whether the environmental court erred in relying on a revised parking plan submitted to the court before trial. Residents contend that the court should not have considered the parking plan because it presented new issues that were not

---

[3] Applicant contends, in the alternative, that if it is not a materials recovery facility, its operation satisfies the definition for another NAICS category permitted in the GZDN: "Wholesaler." Because we find that applicant's operation constitutes a materials recovery facility, we need not address residents' contentions that applicant is not a wholesaler.

addressed by the DRB, and argue that the court should have remanded the new plan to the DRB for public notice and hearing. We review the environmental court's determinations of whether to remand permit applications to administrative review boards for abuse of discretion. *Timberlake Assocs. v. City of Winooski*, 170 Vt. 643, 644, 756 A.2d 774, 776 (2000) (mem); see also *In re Maple Tree Place*, 156 Vt. 494, 501, 594 A.2d 404, 407 (1991) (noting that decision to remand a permit application "necessarily must be an area of trial court discretion").[4]

¶ 18. Applicant submitted a parking plan to the DRB that broadly labeled available parking areas, which the DRB approved as part of the discretionary permit application. As noted above, the environmental court reviewed this initial parking plan in cross-motions for summary judgment, but found that the plan did not establish that applicant could supply adequate parking on the premises. On June 13, 2013, several weeks prior to trial, applicant submitted an amended parking plan to the court with changes that responded to the court's comments. Residents objected to the additional material and filed a motion in limine to exclude it from the merits hearing. The court denied the motion, and relied on the amended parking plan in finding that applicant's parking now satisfied the Bylaws.

¶ 19. ▇ When changes are made to a zoning permit application, the environmental court may remand the application to the tribunal from which the appeal is raised, in this case, the DRB. V.R.E.C.P. 5(j); *In re Chaves Act 250 Permit Reconsider*, 2014 VT 5, ¶ 11, 195 Vt. 467, 93 A.3d 69. Because the environmental court's review is "limited to consideration of the matters properly warned as before the local board," *Maple Tree Place*, 156 Vt. at 500, 594 A.2d at 407 — in other words, those matters which have undergone proper public notice and hearing — we have held that "truly substantial changes to the form or type of an application do require remand." *In re Sisters & Bros. Inv. Group, LLP*, 2009 VT

---

[4] Residents urge a de novo standard of review, citing to *In re Albert*, in which we reviewed de novo the environmental court's interpretation of a Vermont statute governing party standing in a zoning permit appeal. 2008 VT 30, ¶¶ 6-7, 183 Vt. 637, 954 A.2d 1281 (mem.). This case presents a different question — whether the environmental court erred in failing to remand a discretionary zoning permit application when additional materials were submitted to the court on the eve of trial. Because here we are reviewing the environmental court's discretionary determination not to remand, we will review for abuse of discretion.

58, ¶ 21, 186 Vt. 103, 978 A.2d 448. Whether the changes are truly substantial is within the environmental court's discretion, and we have upheld the court's decision to deny remand for revisions that did not "change the nature of the permit requested, alter the location of the project, or increase the scope of the project." *Chaves*, 2014 VT 5, ¶¶ 14-16; see also *Sisters & Bros.*, 2009 VT 58, ¶ 21 (upholding environmental court's decision not to remand permit changes for zoning board approval). Were the environmental court forced to remand for any change that was less than truly substantial, "site-plan review would become a procedural ping-pong match" that would repeat with every revision applicants made in response to concerns by interested parties. *Sisters & Bros.*, 2009 VT 58, ¶ 21.

¶ 20. ▉ Here, as in *Chaves*, "[t]here was no attempt . . . to materially alter the proposal or change the type of permit requested." 2014 VT 5, ¶ 12. In fact, the changes to the amended plan were not nearly so material as the changes in *Chaves*, which included moving an entrance and changing the times of day during which explosives would be used. The environmental court here found that the amended parking plan differed little from the initial parking plan, except to superimpose lines denoting specific parking spaces, and labeling the number of available spots. Rather than presenting issues to the court which had not been addressed by the DRB, the amended plan supplemented information that was already available to the DRB and the environmental court. See *Sisters & Bros.*, 2009 VT 58, ¶ 12. It simply pointed out exactly where the required parking spots would be located, whereas before only general parking areas had been represented.

¶ 21. Residents assert that these changes are similar to those seen in *Maple Tree Place*, where we affirmed the trial court's decision to remand a permit application to the Williston Planning Commission for review of new evidence. 156 Vt. at 495, 594 A.2d at 404-05. There, the trial court found that the developer wished to submit new evidence regarding a significant change to the proposed development plan. Because the new evidence would alter the project to include phased construction, and because "the phasing question could or should have been settled in the planning commission before the matter was ripe for its review," we held that remand was appropriate. *Id.* at 501, 594 A.2d at 407. However, unlike the developers in *Maple Tree Place*, applicant here has neither submitted evidence presenting new issues, nor

proposed significant changes to a large construction project. Because the changes to applicant's plans were not substantial, we hold that the environmental court did not err in not remanding the application.

¶ 22. The final issue on appeal is whether applicant's parking plan conforms to the standards set forth in the Bylaws. The environmental court found after trial that the parking plan complied with all requirements of the Bylaws. Residents contend that the Bylaws require setbacks that would eliminate parking spots located on applicant's subleased land, resulting in insufficient parking. Residents also assert that applicant is required to place a vegetative buffer between the property it leases from the Town and the property it subleases from ReSOURCE, rendering parking spots located on the Town's land inaccessible. Finally, residents argue that dividing the parking between applicant's two parcels does not comply with ownership and use requirements, and that several parking spots are not adequately protected from ice and snow. Our review of the environmental court's construction of zoning bylaws is deferential, and we will uphold those constructions unless they are clearly erroneous, arbitrary, or capricious. *Sisters & Bros.*, 2009 VT 58, ¶ 16.

¶ 23. The Bylaws require that each property in the GZDN have setbacks on all sides, where the only use is landscaped buffers or pedestrian ways. Parking and loading areas are explicitly prohibited from being located in a setback. The Bylaws state that setbacks and buffers are "ordinarily measured" from "the property or right of way line," which residents take to mean that applicant must measure from the deeded property line between the land applicant subleases from ReSOURCE and the land applicant leases from the Town. This would result in several of applicant's parking spaces being impermissibly located within a setback.

¶ 24. ■ We, however, do not read the language "ordinarily measured" to mandate measurement from a deeded property line. Instead, this wording leaves room for situations just like the present one, in which a business leases multiple parcels and uses space on each for its operations. Similarly, rather than referring only to property lines reflected in fee simple deeds, we read "property or right of way line" to mean the outer boundary of a property dedicated to a single use under common legal control.

Such interpretations are consistent with the listed purposes of the Bylaws landscaping standards, which include "ensur[ing] land use compatibility by requiring effective landscaped buffers between potentially incompatible uses."

¶ 25. ▉ Regardless of residents' concerns regarding setback measurements, the Bylaws "eliminate side and rear setbacks" when landscaped buffers are placed between properties with different uses, thus negating the requirement for any setback that would otherwise interfere with applicant's parking. The environmental court found that applicant proposes to create a landscaped buffer along the northerly edge of the leased Town land, and both the Zoning Administrator and the engineer who completed applicant's discretionary permit application testified to the proposal's compliance with the landscaped buffer requirements. By placing a buffer there, applicant will satisfy the intent of the Bylaws landscaping requirements.[5]

¶ 26. Residents next argue that applicant's parking plan violates the Bylaws because parking spaces are located for a single business on two properties with different ownership — the Town and Riggs Properties. The relevant portion of the Bylaws reads: "Off-street parking spaces shall be provided on the same lot or parcel and under the same ownership as the use they serve." Residents take this to mean that the Bylaws require a single entity for both use and ownership, and because applicant's plan places parking spots on both the Town-owned parcel (leased from the Town) and the Riggs Properties-owned parcel (subleased from ReSOURCE), the parking plan violates the Bylaws. Again, it seems that residents are parsing the Bylaws too finely.

¶ 27. ▉ The Bylaws do not provide a definition of "ownership" to qualify "the same ownership as the use [the parking spots] serve." However, the Bylaws define "applicant" as "the owner or owners of the property on which the development is proposed." Logically, the word "owner" must extend to lessees and sublessees, who have limited ownership interests in the property they lease or sublease. See *In re Stokes Commc'ns Corp.*, 164 Vt. 30, 37, 664 A.2d 712, 716 (1995) (stating that thirty-year lease provided lessee with "limited ownership interests"). Otherwise, the

---

[5] Residents also contend that, like setbacks, landscaped buffers must be placed between parcels along a deeded property line. We reject this argument for the same reason we reject their interpretation of setback-measurement requirements.

Bylaws would preclude any person or business not actually holding the deed to a property from applying for a discretionary permit. Because applicant leases and subleases property from the Town and Riggs Properties respectively, applicant is considered an owner for the purposes of this Bylaws requirement.

¶ 28. Residents' next argument is that certain parking spaces located next to a roofed overhang on the subleased parcel violate another Bylaws requirement — that "parking areas . . . must be protected from ice and snow sliding off roofs." The environmental court concluded after trial that this chapter of the Bylaws applies only to new construction, and therefore does not apply to applicants here. We agree with this conclusion. The ice and snow protection requirement is found in the design review chapter of the Bylaws, which is intended "to help ensure that new buildings and major additions to existing buildings along Williston's major roads make a positive contribution to the visual character" of the Town. Applicant does not propose any "new buildings" or "major additions to existing buildings." The parking spaces that residents claim offend this Bylaws chapter are located next to a pre-existing building to which applicant proposes no changes.

¶ 29. Finally, in a last effort to disqualify applicant's permit, residents declare that the parking plan is unworkable. However, applicant provided ample testimony that there have been no problems with parking to date, and that the proposed plan is tenable. The engineer who prepared the plan testified that the parking plan created a "functional traffic flow." And although residents called their own expert witness to testify against the workability of applicant's plan, residents do not mention his testimony on this particular issue, and provide no substantive argument as to why we should find the parking layout to be, in their words, a "dysfunctional mix of traffic." We therefore find no reason to second guess the environmental court's finding that the application complied in all respects with the Bylaws. As a result we must affirm the environmental court's granting of applicant's discretionary permit.

*Affirmed.*