NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 80

No. 2020-261

In re Wright & Boester Conditional Use Application
(Day Patterson and Janet Showers, Appellants)

Supreme Court

On Appeal from
Superior Court,
Environmental Division

May Term, 2021

Thomas S. Durkin, J.

Christopher D. Roy of Downs Rachlin Martin PLLC, Burlington, for Appellants.

Anthony N.L. Iarrapino of Wilschek Iarrapino Law Office, PLLC, Montpelier, for Appellees.

Sara Davies Coe of Davies Law, PLC, Barton, for Amicus Curiae Town of Greensboro.

PRESENT: Robinson, Eaton, Carroll and Cohen, JJ., and Corsones, Supr. J., Specially Assigned

¶ 1. **EATON, J.** Applicants Marian Wright and Greg Boester and their neighbors, Day Patterson and Janet Showers, own abutting parcels of land on the shore of Caspian Lake in Greensboro. Neighbors appeal from an Environmental Division decision granting applicants a permit to tear down and reconstruct a lakeside structure on their parcel in accordance with a revised plan they submitted just prior to trial. We reverse, concluding that the court erred both when it determined that the structure at issue was properly designated an "accessory structure" rather than a "boathouse" under the applicable zoning bylaws and when it declined to remand the materially revised proposal for consideration by the municipal developmental review board in the first instance.

I. Factual & Procedural Background

¶ 2.     The following facts are drawn from the Environmental Division's findings.  The parties own neighboring waterfront properties situated on Black's Point, a small peninsula in Caspian Lake.  Both properties are accessed using a private road which ends in a circular turnaround serving a small cluster of homes on the Point.

¶ 3.     Applicants' parcel contains a house, a shed, and the two-story lakeside structure which is the subject of this dispute.  The structure is visible from the turnaround, from an established path running along the shoreline, and from the lake.  Because of its location on the sloped shore, it appears to be a single-story building when viewed from the turnaround, while both floors are visible from the lake.  Its first floor is used to store canoes, kayaks, and related accoutrements; double doors open to a wooden dock extending onto the lake.  Because the building is situated close to the boundary of neighbors' property, a portion of that dock may encroach on neighbors' parcel by a matter of inches.  The structure's upper level—accessed through an external door facing the turnaround—has several rooms, windows overlooking the lake, and a toilet, sink, and shower.  This floor is used both as additional living space and for storage of household items.

¶ 4.     In December 2017, applicants sought a conditional use permit or variance from the Greensboro Development Review Board (DRB) allowing them to demolish and rebuild the lakeside structure on its existing footprint, but add a third level, increasing the building's height by ten feet.  The DRB considers such proposals against the Greensboro Zoning Bylaw, which is intended to provide for "orderly community growth" and "further the purposes of the . . . Greensboro Town Plan."  Greensboro Zoning Bylaw [Bylaw] § 1.2, https://www.greensborovt.org/wp-content/uploads/2012/10/Greensboro-Zoning-Bylaw-Original-2015.pdf [https://perma.cc/2QQJ-JHGD].  The Town Plan recognizes Caspian Lake as "the Town's natural resource jewel."  In order to maintain this resource, the Plan includes several

2

goals relevant here: (1) to preserve Caspian Lake and the surrounding land as a recreation area; (2) to protect its shorelines from erosion and overdevelopment; and (3) to "ensure the views of our rural landscape are not significantly altered by man-made structures that are out of character with the community."

¶ 5.     Because it is built on land contiguous to Caspian Lake, the structure at issue here is located within what the bylaws designate as the Shoreland Protection District (SPD). Id. § 2.7(A). The SPD was established to protect "surface water resources" on Caspian Lake and to preserve the mix of residential and summer homes, together with the "recreation uses traditional to the[] lake[]." Id. § 2.7(B). The structure is also located within an area the bylaws designate as the Shoreland Buffer Resource Zone (SBRZ), which encompasses the land on the shore of the lake "consisting of trees, shrubs, Natural Ground Cover and an understory of plants that functions to filter runoff, control sediment and nutrient movement, control erosion and provide fish and wildlife habitat." Id. § 8.4.

¶ 6.     The Greensboro Zoning Bylaw came into effect in 1972, after the existing structure was built. It is undisputed that the structure is therefore a legal nonconforming structure. Legal nonconforming structures are those constructed prior to the adoption of the bylaws, or under an earlier, less-restrictive iteration thereof, which are not in compliance with the provisions of the current bylaws. Id. § 3.8. Although such structures may exist "indefinitely" under the bylaws, they may not be "moved, altered, extended, or enlarged in a manner which will increase the existing degree of nonconformance." Id. § 3.8(A), 3.8(A)(1). They may, however, be demolished and reconstructed—subject to DRB approval and where such reconstruction does not increase the original structure's degree of nonconformance. Id. § 3.8(A)(2). The same general principle applies to lawful nonconforming uses predating zoning: they may continue "indefinitely" but may not be expanded or extended such that the degree of nonconformance increases. Id. § 3.8(B).

3

¶ 7. In the bylaws, the only exception to the prohibition on new development within 150 feet of Caspian Lake applies to boathouses; a single boathouse may be added to a tax lot as a conditional use within the SBRZ. Bylaw § 8.8(B)(3). A "boathouse" is defined as "[a] building at or near the high[-]water mark used only for storage of boats." Id. § 8.4. Regulations on boathouses were amended in 2015 to limit each lot to one boathouse and prohibit boathouses from having decks or porches. Id. at 6. The bylaws cap the maximum height for a boathouse at fifteen feet. Id. § 8.8(B)(3)(d). An "accessory structure," in contrast, is a catchall designation encompassing buildings "customarily incidental and subordinate to a principal building" on the same lot or an adjoining lot with the same owner; such structures may be twice as tall as boathouses, with a maximum height of thirty feet. Id. §§ 2.7(E), 9.2.

¶ 8. In February 2018, the DRB approved the permit application with conditions. It rejected applicant's assertion that the structure was an accessory structure subject to the thirty-foot height limit and concluded that the structure was a "boathouse" as that term is defined in the bylaws, albeit one with living space above it, and thus subject to the more restrictive fifteen-foot height limit. It therefore denied the application with respect to the proposed addition of a third story. Because applicants represented that the building was to be constructed on the preexisting nonconforming footprint, the DRB did not consider the applicable setback standards. The upshot was that the DRB approved reconstruction of the structure on its existing footprint, but only to its existing height, finding that this ensured the rebuilt structure would not increase the existing degree of nonconformity.

¶ 9. Applicants appealed the DRB's decision to the Environmental Division. There, they filed a motion for summary judgment asking that the court find, as a matter of law, that the existing structure is properly characterized as an "accessory structure" rather than a "boathouse" under the bylaws. The Town and neighbors filed a joint cross-motion requesting that the court enter judgment that the applicants could not reconstruct the building to the proposed height

4

without causing an "undue adverse effect" on the surrounding area within the meaning of the bylaws. The Environmental Division granted summary judgment for applicants on the first question, agreeing that the building is properly classified as an "accessory structure," and not a "boathouse" under the bylaws. However, it denied summary judgment for neighbors and the Town on the "undue adverse effect" question after concluding that the issue was not raised in the statement of questions filed on appeal. Finally, it granted applicants permission to amend their statement of questions to add a question challenging the DRB's decision that the proposed structure fell short of the conditional-use standard at Bylaw § 5.4(C)(5).

¶ 10. Shortly before trial on the merits of the application, applicants submitted a redesigned plan for the structure which differed from their initial proposal in several respects. It continued to include a third story, but was three feet shorter than the initial proposal—making it seven feet higher than the existing structure, lower than the maximum height for accessory structures, and higher than the maximum height for boathouses. This was accomplished by reducing the height of the first-floor boat-storage area to a four-foot-high "crawlspace." Applicants also proposed to rotate the reconstructed building's footprint[1] away from its current location by several inches and move the entire structure three feet further away from the shoreline. They represented that the purpose of this revision was to respond to concerns by neighbors about the location of their dock with reference to the property line. Given the shift away from the shoreline, applicants also proposed to install a fiberglass ramp from the lower level's double doors into the lake in order to facilitate access and mitigate erosion. The relocation would reduce—but not eliminate—the structure's nonconformity with the bylaws' setback requirement.

---

[1] The bylaws define a "building footprint" as the "gross floor area encompassed by a building's outer walls," not including "porches, decks, patios, exterior landings, storage areas[,] or garages." Bylaw § 8.4. The building footprint in this case remains constant while applicants' proposal would place the building partially into a new area.

5

¶ 11. Neighbors and the Town requested that the redesigned plan be remanded to the DRB. The Environmental Division declined to do so, noting that the changes were made in response to neighbors' concerns and were not so "material and substantial" as to require remand to the DRB. Instead, it issued its decision on the merits of the redesigned structure.

¶ 12. In doing so, the court noted that the evidence and legal arguments presented at trial did not alter its pretrial determination that the structure is appropriately designated an accessory structure—rather than a boathouse—under the bylaws. Turning to the remaining questions on appeal, it noted that the structure was a lawful nonconforming structure which could be reconstructed so long as that reconstruction did "not increase the existing degree of nonconformance of the original structure." The court found that none of the revisions to applicants' proposal would increase the structure's degree of nonconformance; therefore, the project could go ahead so long as the plans complied with the applicable conditional-use criteria.

¶ 13. With respect to these criteria, only the structure's impact on the character of the area, see Bylaw § 5.4(B)(2), and compatibility with other structures in the area, see Bylaw § 5.4(C)(5), were challenged in applicants' statement of questions. As part of the former analysis, the court determined that the new structure would not have an adverse impact on the surface-water resources the SPD was established to protect. It reasoned that "[w]hile the position of the Structure will be relocated slightly, the building footprint will remain the same. Thus, the proposal will not increase impervious surface or associated runoff into the lake." After considering several other arguments, the Environmental Division held that the structure would neither have an adverse impact on the character of the area nor be incompatible with neighboring structures. The court thus approved the application, ordering that the reconstruction be completed in accordance with the revised plan.

6

¶ 14. Neighbors appeal from this decision,[2] arguing that the Environmental Division erred in: (1) determining that the building was an "accessory structure" rather than a "boathouse" under the bylaws; (2) holding that by declining to cross-appeal the DRB decision, neighbors foreclosed the Environmental Division's consideration of whether the structure's increased height would improperly expand a nonconformity; (3) allowing applicants to add a new issue to their statement of questions following the close of discovery and after the parties' summary-judgment motions were resolved; (4) concluding that the redesigned structure's location was compatible with surrounding structures; and (5) declining to remand the redesigned structure proposed for the first time before the Environmental Division to the DRB for consideration in the first instance.

¶ 15. We turn first to the identity question: under the bylaws, is the redesigned structure a boathouse or is it an accessory structure? We conclude that the structure is a boathouse with a preexisting nonconforming use under the bylaws, and therefore do not reach the other issues presented in this appeal. However, because of the possibility of these issues arising again upon submission of a new application, we provide additional guidance by determining that the trial court should have remanded the redesigned proposal to the DRB for its consideration in the first instance.

## A. Classification of Structure

¶ 16. The interpretation of a zoning ordinance presents a legal question which we review without deference to the Environmental Division. In re Confluence Behav. Health, LLC,

---

[2] The Town filed an amicus brief arguing—as neighbors do—that the Environmental Division erred in declining to remand the revised proposal to the DRB.

2017 VT 112, ¶ 17, 206 Vt. 302, 180 A.3d 867.[3]  As with statutory interpretation, our goal in interpreting a zoning ordinance is to effectuate the intent of the drafters.  In re Howard Ctr. Renovation Permit, 2014 VT 60, ¶ 9, 196 Vt. 542, 99 A.3d 1013.  And because "[t]he primary purpose of zoning is to bring about the orderly physical development of a community," it is "essential" to our inquiry that we examine not only the plain language of the disputed ordinance, but also the whole of the enactment, seeking to effectuate its every part.  In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 13, 190 Vt. 132, 27 A.3d 1071 (quotations omitted).  Where the ordinance's "express language leads to an irrational result," we turn to other sources to guide our inquiry into the drafters' intent.  Confluence Behav. Health, 2017 VT 112, ¶ 20 (quoting Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 6).  Because zoning ordinances exist in derogation of private property rights, such ambiguities are resolved in favor of the landowner.  In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 29, 199 Vt. 19, 121 A.3d 630.

¶ 17.  With these principles in mind, we consider whether the Environmental Division was correct in classifying the structure as an "accessory structure" rather than a "boathouse" within the meaning of the bylaws.  As set forth above, the bylaws define a "boathouse" as "[a] building at or near the high[-]water mark used only for storage of boats."  "Accessory structure" is the designation applied to supplemental structures on a property which defy classification. The distinction, as the parties recognize, is pivotal, because an accessory structure may be twice as tall as a boathouse under the bylaws.

¶ 18.  Applicants argue that the bylaw is ambiguous as applied to this situation because the structure serves both as a boathouse and for purposes outside the narrow scope of the

---

[3]  Applicants' proposed arguments pertaining to bylaw history were fatally unpreserved. However, the overarching issue of the interpretation of the zoning ordinance, including specifically the context of increasing restrictions over time, was raised before and extensively discussed by the trial court below.  See State v. Mumley, 2009 VT 48, ¶ 18, 186 Vt. 52, 978 A.2d 6 (stating that argument is preserved for appeal "where a litigant's argument is clear enough for the trial court to evaluate it and for an opponent to respond to it").

definition of boathouse. We disagree: we conclude that the bylaws are harmonized by an interpretation which holds this structure is a boathouse with a lawful nonconforming use.

¶ 19. Finding the preexisting structure here a boathouse fits with the Town's intent to gradually increase restrictions over time in order to protect the lakeshore. The purpose of the bylaws is to promote the Greensboro Town Plan, which aims to preserve the lake and its surrounding land and protecting the shorelines from erosion and overdevelopment. In furtherance of this objective, the Town created the SBRZ to protect the lakeshore on which the structure at issue in this case sits. Bylaw § 2.7(A). In the bylaws, boathouses are the only new development permitted within 150 feet of Caspian Lake, indicating an intent to protect the lakeshore by limiting buildings on it to a specific type. Id. § 8.8(B)(3). Furthermore, the bylaws have been amended over time to increase restrictions on what may be a conforming boathouse. For example, in 2015, the bylaws were amended to add "[o]ne [boathouse] per tax lot" and "[n]o decks or porches" to the regulations. Id. at 6 (comparing past regulations with current regulations on Caspian and Eligo).

¶ 20. Reading the bylaws as a whole, the other provisions regulating boathouses support the conclusion that it is new and not preexisting structures which may "only" store boats. See In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 13 (explaining zoning ordinances are construed using whole of the ordinance as well as plain language (quotation omitted)); Bylaw § 8.8(3)(h) (stating that "new or reconstructed Boat House shall be used only for storage of boats"), id. § 8.4 (defining nonconforming structure as one "that does not conform to the present Bylaw but did conform to all applicable laws, ordinances, and regulations prior to the enactment of the present Bylaw").

¶ 21. To conclude otherwise would allow any preexisting structure not fitting the exceedingly narrow definition of a boathouse to be up to thirty feet high. It would also allow landowners to build a "boathouse" as defined by the current bylaws in addition to the preexisting

9

"accessory structure" thereby increasing the burden on the shoreline—an outcome exactly opposite the drafters' intent described above. Bearing in mind that "[o]ne of the primary goals of zoning is to gradually eliminate nonconforming uses because they are inconsistent with the purpose of developing use-consistent areas in communities," we cannot endorse such a conclusion. In re Casella Waste Mgmt., Inc., 2003 VT 49, ¶ 9, 175 Vt. 335, 830 A.2d 60 (quotation omitted); see also In re Miserocchi, 170 Vt. 320, 327, 749 A.2d 607, 613 (2000) (recognizing that "a goal of zoning is to phase out nonconforming uses").

## B.  Failure to Remand

¶ 22.    We then turn to the question of whether the trial court should have remanded the redesigned structure to the DRB.  Though our classification analysis is fatal to the permit application in this case, we provide this analysis in the event of a new application.  We review the Environmental Division's decision not to remand an amended proposal to the relevant municipal panel for an abuse of discretion. Timberlake Assocs. v. Winooski, 170 Vt. 643, 644, 756 A.2d 774, 776 (2000) (mem.).  In order to avoid the type of "procedural ping-pong match" occasioned by requiring every minor revision presented to the trial court to be remanded for municipal consideration, we have distinguished between "truly substantial changes to the form or type of an application," which necessitate remand, and proposed revisions which "do not materially change the pending application or type of permit requested," which do not. In re Sisters & Bros. Inv. Grp., LLP, 2009 VT 58, ¶ 21, 186 Vt. 103, 978 A.2d 448.  Thus, only "truly substantial changes to the form or type of an application" must be remanded for consideration by the DRB in the first instance. Id.  This is so because, in reviewing a municipal decision like the one at issue here, the Environmental Division

> act[s] within its proper role when it decides questions that have
> been formulated in the local approval process and which divide the
> parties.  It is beyond its role as an appellate tribunal, even under a
> de novo review standard, to start addressing new issues never
> presented to the planning commission and on which interested

persons have not spoken in the local process.  Use of the remand authority in such cases is consistent with the court's role.

In re Maple Tree Place, 156 Vt. 494, 500, 594 A.2d 404, 407 (1991) (invoking "cautionary language of Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 13, 556 A.2d 103, 106 (1989), that 'the court must resist the impulse to view itself as a super planning commission' ").

¶ 23.  A review of cases in which we found that the proposed changes were—as applicants urge us to conclude here—"minor" and thus not requiring remand is instructive.  For example, in In re Chaves Act 250 Permit Reconsider, applicants seeking an Act 250 permit for operation of a sand-and-gravel quarry—which had already been in existence unpermitted for at least fifty years—proposed changes to the project while it was on appeal before the Environmental Division.  See generally 2014 VT 5, 195 Vt. 467, 93 A.3d 69, abrogated on separate grounds by In re B & M Realty, LLC, 2016 VT 114, ¶ 31 n.2, 203 Vt. 438, 158 A.3d 754.  The proposed changes included scrapping plans for a new entrance to the quarry in favor of an existing access road, changing the loading area to mitigate noise, adding noise-mitigation berms, limiting the number of truck trips per day, establishing a blasting plan, and limiting the days and weeks when drilling, blasting, and crushing could take place.  The neighbors, focusing particularly on the changed access point, argued that these changes were material and therefore required remand to the district commission for consideration in the first instance, but the trial court declined to do so.  We affirmed, observing that the proposed revisions "did not change the nature of the permit requested, alter the location of the project, or increase the scope of the project," observing that neighbors "were aware that the historic entry point" differed from that originally proposed, and also pointing out that the neighbors knew the project could be modified while on appeal because in reviewing Act 250 projects, courts must consider "all reasonable alternatives" which do not "chang[e] the very essence of the project."  Id. ¶¶ 6, 14, 19-20.

¶ 24. In In re All Metals Recycling, Inc., we considered the argument that the Environmental Division erred in not remanding an application for municipal review when the applicant submitted a revised parking plan several weeks before trial and held that no remand was required where the amended plan "simply pointed out exactly where the required parking spots would be located, whereas before only general parking areas had been represented." 2014 VT 101, ¶ 20, 197 Vt. 481, 107 A.3d 895 ("Rather than presenting issues to the court which had not been addressed by the DRB, the amended plan supplemented information that was already available to the DRB and the environmental court."). Likewise, in Timberlake Associates we concluded that the Environmental Division did not abuse its discretion by declining to remand a revised application to the zoning board where the record demonstrated that all "pertinent issues concerning [the] application were presented" to the board in the first instance. 170 Vt. at 644, 756 A.2d at 776. As a result, the court did not "overstep its proper role by addressing new issues or issues on which interested persons had not spoken," nor did it "confront a statutory-interpretation issue of first impression in which the [board's] construction might have been determinative." Id. at 645, 756 A.2d at 776.

¶ 25. In contrast, in this case, the revisions presented were not minor because they implicated additional analyses the DRB did not have occasion to consider below and because they might have invoked comment from interested persons who had no objection to the original plan. The new proposal would shift the building much closer to the current nonconforming septic system and add a fiberglass ramp at the shoreline within the heavily regulated SBRZ. [4]

---

[4] Applicants argue that neighbors failed to preserve their argument that the proposed relocation increases the structure's nonconformity with the required fifty-foot setback from private roads in § 2.7(E) of the bylaws by failing to raise the issue. Applicants also argue that the trial court made no finding regarding the private road setback and that the DRB found that the originally proposed structure was not in violation of the private road setback requirement. We do not reach these arguments because the issue of the private road setback does not change the outcome in this case.

¶ 26. The DRB's finding that the rebuilt structure would not increase the existing degree of nonconformity was expressly predicated on its belief that the structure would, as initially proposed, "be built on the existing nonconforming footprint." Had it been presented with the revised plan, then, it is clear that the DRB would have considered anew whether the relocation impermissibly increased the structure's degree of nonconformance with respect to the multiple setbacks at issue. But because the revised structure was presented only at the appellate level, the DRB did not have the opportunity to consider the setback issue it implicates. See Maple Tree Place, 156 Vt. at 499-500, 594 A.2d at 407 (explaining that "interpretation of a zoning ordinance by municipal zoning staff and the zoning board can be determinative in a close case as the interpretation of an ordinance by the administrative body responsible for its execution" (alteration omitted) (quotation omitted)).

¶ 27. The DRB also did not have occasion to analyze whether such relocation impacted other property owners on Black's Point who use the road. See Bylaw § 2.7. We cannot foreclose the possibility that the revised plan might have invoked comment from an interested person who had no objection to the original plan: it is not for the Environmental Division or this Court to speculate about whether a given change is likely to draw such opposition. See In re Torres, 154 Vt. 233, 236, 575 A.2d 193, 195 (1990) (explaining, in holding that board or court could not waive notice provision, that "[h]owever certain they may be that notice of an application for a conditional use permit would attract no more opposition than the notice of the 'home occupation' application, it is not for the parties, the boards, or the courts to dispense with the public notice mandated by the statute").

¶ 28. The addition of the fiberglass ramp implicates the analysis set forth at § 8.9, applicable to nonconforming uses and structures within the SBRZ. In this heavily-regulated buffer area, any proposed relocation of a nonconforming structure within the lakeshore setback must be carefully scrutinized. For example, as the Town points out, while applicants propose to

move the structure several feet back from the shoreline, they do not propose to restore the "disturbed area[] . . . to a naturally vegetated state with supplemental planting of appropriate native vegetation" as required where a nonconforming structure is relocated within the SBRZ. Bylaw § 8.9(C)(2). The addition of the fiberglass ramp could also bear on the assessment of the structure's impact on surface-water resources, as it is not entirely clear whether it will increase the plan's impervious surface area.[5]

¶ 29. Although the relocation of a structure by a matter of feet might be a minor change not requiring remand under many circumstances, we cannot so conclude under the circumstances of this case. In drafting its zoning ordinances, the Town of Greensboro placed a dual layer of protection on the delicate shoreline ecosystem in which applicants seek to reconstruct their boathouse. Because the revised proposal presented issues to the court which had not been addressed by the DRB and on which potential interested persons had no occasion to speak, the Environmental Division should have remanded it to the municipal board for its consideration in the first instance. Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 109 (holding Environmental Division's discretion to refuse requested remand of revised proposal does not extend "to project revisions that may implicate new criteria not before the environmental court or affect new parties not participating in the proceedings").

Reversed.

FOR THE COURT:

_____

Associate Justice

---

[5] Testimony before the Environmental Division stated the ramp was permeable. The court only found that the ramp was made of fiberglass, and did not further describe its surface, though it concluded the overall impervious footprint would not be increased.