VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org

Docket No. 57-8-20 Vtec



| | |
|---|---|
| In re Wolcott SD Final Plat Denial | DECISION ON MOTIONS |

James Wolcott ("Applicant") and neighbor David Hering ("Neighbor") have filed cross motions for summary judgment in Mr. Wolcott's appeal from a final decision of the Town of Cambridge Development Review Board ("DRB") denying his application for subdivision approval. The Town of Cambridge ("Town") joins and adopts Neighbor's motion for summary judgment and opposition to Applicant's motion. Also before the Court is Neighbor's motion to supplement his Statement of Undisputed Material Facts.

Applicant is self-represented. Neighbor is represented by Claudine Safar, Esq. and Christian Chorba, Esq. The Town is represented by James Barlow, Esq.

## Background

Applicant is seeking to subdivide a parcel of land he owns on Gallup Brook Lane in the Town of Cambridge ("the Property"). Applicant proposes to divide the roughly 80-acre parcel into three lots. He filed his application for final plat approval with the DRB in May and June of 2020. The DRB held a public hearing on that application on July 13, 2020 and denied approval in a final decision dated July 24, 2020.

Prior to applying for approval from the Town, Applicant completed a project review sheet with the Department of Environmental Conservation (DEC). The review sheet underwent multiple revisions based on amendments to Mr. Wolcott's proposal, with what we understand to be the final version published on March 5, 2020. *See* Neighbor's Exh. 1, Wolcott Subdivision Application at 10–12 (hereinafter "Subdivision Application"). For the DEC review, which takes

place under state environmental permitting requirements, Mr. Wolcott proposed to subdivide the parcel into Lot 1 (7.5 acres) Lot 2 (6.8 acres) and Lot 3 (roughly 65 acres). He proposed that Lots 1 and 2 would each be developed with one single-family residence, on-site wastewater system and potable water supply. He proposed no new development for Lot 3 and indicated that he would remove four of the existing six structures located there, leaving a 12' x 12' primitive camp and 10' x 40' box trailer to be used as personal storage. Id.

Through that review, the District Coordinator determined that the proposed project did not trigger Act 250 jurisdiction, as it did not constitute development as defined in the Act 250 rules. Additionally, the DEC Assistant Regional Engineer determined that a state wastewater system and potable water supply permit was required for the creation of residences on Lots 1 and 2. Finally, the DEC Permit specialist issued a preliminary non-binding opinion that multiple other state permits as well as local permits were likely required. Id. We understand the DRB opinion to indicate that Mr. Wolcott subsequently applied for and received a wastewater and potable water supply permit from the State. *See* In re James Wolcott, Permit No. SD-2020-02, Findings of Facts ¶ 6 (Tn. of Cambridge Dev. Review Bd., July 24, 2020) (hereinafter "In re Permit No. SD-2020-02").

We discuss these prior applications in some detail to clarify a point of apparent confusion. Mr. Wolcott, through his subdivision application and his filings, has repeatedly and mistakenly suggested that DEC had approved of his plans for the subdivision and that this entitled him to municipal approval. The project review sheet is very clear that it is not a permit, but rather an opinion as to which permits and state approvals a proposed project may require—it says in bold print at the top of the first page, "This is not a permit." To be clear, even had a state agency issued one permit for a project, that would not, absent other facts, preclude a local zoning board or other decision maker from denying local permit approvals. Further, different local and state statutes in Vermont have different definitions of terms such as "development" and whether a project constitutes development under one statute may be unrelated to whether it is development under a different statute.

Mr. Wolcott's cover letter to his subdivision application describes the project in terms that largely mirror the March 5, 2020 DEC project review sheet. *See* Subdivision Application at 1–3. He proposes three lots, with approval for one single family home each on Lots 1 and 2 and no new development on Lot 3. The cover letter also suggests that there are or were existing structures on all three lots. As to Lot 3, it suggests that "two structures shall remain" after subdivision and "the rest shall be removed," without indicating the number to be removed or the nature of each structure. Id. While the plat map submitted with his application, however, depicts existing structures on Lots 1 and 2, it does not depict any existing structures on Lot 3. *See* Id. at 4, "Subdivision Plat."

## Discussion

Before turning to the cross motions for summary judgment, we offer one clarification based on the party's filings and address the outstanding motion. First, Neighbor's motion for summary judgment indicates his understanding that we have not yet addressed Applicant's first motion to amend his statement of questions.[1] We granted that motion, however, on the record at a status conference held on December 21, 2020, at which Neighbor was represented by different counsel. We understand the confusion may in part have been generated by the fact that our decision on Neighbor's motion to strike Mr. Wolcott's Statement of Questions[2] referred exclusively to the Statement of Questions as filed on August 10, 2020. We apologize for this confusion; however, having granted this motion on the record and not addressed its questions in the motion to strike, we must treat these questions as having become part of the Statement of Questions.

I.    Motion to admit Supplemental Statement of Undisputed Material Facts:

---

[1] Neighbor subsequently filed a second motion to amend the Statement of Questions, which we denied as the proposed additional questions raised issues outside the scope of our subject matter jurisdiction. In re Wolcott SD Final Plat Denial, No. 57-8-20 Vtec, slip op. at 5 (Vt. Super. Ct. Envtl. Div. Mar. 4, 2021) (Walsh, J.).

[2] We treated this motion as one to dismiss the appeal under 12(b)(1), since the arguments were directed at the legal sufficiency of the claims. Wolcott SD Final Plat Denial, 57-8-20 Vtec, slip op. at 2 (Vt. Super. Ct. Envtl. Div. Aug. 11, 2021) (Walsh, J.).

There is an outstanding motion by Neighbor to allow him to supplement his Statement of Undisputed Material Facts. Neighbor filed that motion after receiving Applicant's response to his original Statement of Undisputed Material Facts and cross motion for summary judgment. Through that response, Applicant claimed there existed a genuine dispute of material fact as to whether any structures existed on Lot 3 at the time he submitted his subdivision application. Neighbor has therefore moved to add three additional paragraphs to his Statement of Undisputed Material Facts, supported by four exhibits, which, he claims, provide further evidence that these structures existed. Because we find below that Applicant has not created any genuine dispute of material fact as to the existence of those structures, we **DENY** this motion as moot.

II.     Cross Motions for Summary Judgment

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5. The nonmoving party "receives the benefit of all reasonable doubts and inferences," but must respond with more than unsupported allegations in order to show that material facts are in dispute. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356. For the purposes of the motion, the Court "will accept as true the allegations made in opposition to . . . summary judgment, so long as they are supported by affidavits or other evidentiary material." Id. When considering cross-motions for summary judgment, as we do here, the Court considers each motion individually and gives the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332.

In an appeal to the environmental division, the scope of appeal, including in a de novo review, is generally limited to those issues raised by an appellant's Statement of Questions. *See* Reporter's Notes, V.R.E.C.P. 5(f); In re Joyce, 2018 VT 90, ¶ 15, 208 Vt. 226. As with a complaint in a civil action, a Statement of Questions should therefore provide a short and plain statement of the legal and factual issues the appellant wishes the Court to resolve. Reporter's Notes V.R.E.C.P. 5(f). Because of this function of the Statement of Questions, parties before our Court typically direct their motions for summary judgment to some or all of the questions contained in

4

the Statement of Questions. We accept that in this case, doing so was made more difficult by the way in which Applicant, a pro se litigant, has framed his questions. Those questions do not clearly express the errors that Applicant believes the DRB made in denying his application, but instead ask about the meaning and applicability of the various provisions of the bylaws, including those cited to by the DRB. Subsequent developments in the case, chiefly our dismissal of many questions in response to Neighbor's motion to strike, have helped focus the Statement of Questions on the relevant legal issues. However, some lack of clarity remains.

As we noted in our decision on the motion to strike, we read Applicant's Statement of Questions with some leniency in light of our obligation to assure he does not suffer an unfair disadvantage as a pro se litigant. Wolcott SD Final Plat Denial, 57-8-20 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Aug. 11, 2021) (Walsh, J.) (citing Sandgate Sch. Dist. V. Cate, 2005 VT 88, ¶ 9, 178 Vt. 625).[3] In that decision, we declined to dismiss those Questions that related to the DRB's conclusions and raised issues within our subject matter jurisdiction in a de novo review. Id. In the same spirit, Neighbor directs his motion for summary judgment to all four of the DRB's stated grounds for denial of the application, arguing that the DRB was correct, and its conclusions should be affirmed. This approach, which elevates substance over form, is a sensible way of treating the somewhat chaotic Statement of Questions. Applicant cannot be prejudiced by this approach, which interprets his Statement of Questions to raise all the legal issues he could have raised with the DRB's conclusions. Moreover, in his cross motion for summary judgment, he adopts the same structure. We will therefore follow suit, although we have re-organized the issues from the DRB and Neighbor's second and third grounds for denial for greater concision and clarity.

A.    *Whether the subdivision application must be denied because it does not show the 'existing features including buildings' and 'existing foundations' on Lot 3?*

---

[3] While the Court recognizes its important obligation to protect pro se litigants, such as Applicant in this case, from being the victim of unfair advantage, it is not this Court's responsibility to offer affirmative help to a pro se litigant. See Nevitt v. Nevitt, 155 Vt. 391, 401 (1990) (citing Olde & Co. v. Boudreau, 150 Vt. 321, 322 (1988)). Like all others, unrepresented litigants are bound by the ordinary rules of civil procedure. Vahlteich v Knott, 139 Vt. 588, 590–91 (1981).

The DRB determined, and Neighbor argues we should affirm, that the application for subdivision is incomplete because Mr. Wolcott's final plat does not depict buildings and possibly foundations of buildings that by his own admission existed on Lot 3 at the time of the application.

Under the Subdivision Regulations, § 3.02(B)(1), the final plat application must include:

"A map of the property prepared by a licensed land surveyor, registered civil engineer, or registered architect, showing the existing conditions including:
a. The number of acres within the original parcel; location of existing property lines; existing easements, deed restrictions; and *existing features including buildings*; wooded areas; roads; water courses and wetlands; *existing foundations*; and other existing physical features, including prime and statewide agricultural soils." (emphasis added).

Neighbor claims that there were both buildings and foundations for buildings on Lot 3 at the time of application; that these were not shown on any map accompanying that application; and that the application is therefore incomplete and must be denied. As evidence for the existence of the buildings, Neighbor cites the following:

1. In the DEC project review sheet, which Applicant attached to his subdivision application to the DRB, DEC summarized Applicant's representations as to the structures existing on Lot 3: "An 8' X 30' camper, an 8' x 10' shed, an 8' x 30' RV . . . an 8' x 30' RV . . . [a]n abandoned 12' x 12' primitive camp and a 10' x 40' box of an 18 wheeler." According to that review sheet, Applicant proposed to remove the first four structures by September 1, 2020 and leave the final two on the property. *See* Subdivision Application at 10. Of these structures, at the very least the shed and the primitive camp would be buildings or foundations for buildings.

2. In the cover letter to his subdivision application, Applicant referred to these representations on the DEC review sheet, stating "Two structures [on Lot 3] shall remain as stated in DEC Project Review Sheet. The rest shall be removed as stated in DEC Project Review Sheet."

3. In a site visit to the property on June 8, 2021, Neighbor's counsel reports having viewed three separate buildings on Lot 3. Counsel submitted photographs of these buildings as Exhibits 9(a), 9(c) and 9(d) to Neighbor's Statement of Undisputed Material Facts.

4. In his remarks at the DRB's public hearing on Applicant's Subdivision application, the DRB chair reported having viewed multiple buildings and other structures on Lot 3 during an inspection of the property.

*See* Neighbor's Statement of Undisputed Material Facts, ¶¶ 3, 4, 10, 12, 15.

This evidence is sufficient to presumptively establish that there existed at least two buildings and/or foundations on Applicant's property at the time he filed his subdivision application: the 8' x 10' shed and the 12' x 12' camp. Whether Applicant planned to thereafter remove the shed is irrelevant to whether he was required to depict it on his subdivision map; the plain language of the bylaws indicate that all existing buildings must be depicted.

In his response to Neighbor's motion, Applicant argues that there exists a genuine dispute as to whether buildings existed on his property at the time of the application. At the end of his motion, Applicant includes a response to Neighbor's Statement of Undisputed Material Facts, in which he disputes the relevance of the DEC project review sheet and the cover letter to his subdivision application. Applicant's Statement of Undisputed [sic] Material Facts ¶ B. Applicant also seeks to contest Neighbor's reliance on photographs taken by Neighbor's attorney because "[e]ach photograph is not specific as to time and place on the property of the Applicant." Id. ¶ D.

Mr. Wolcott has not raised a genuine dispute because he has not supported his claim that there were no structures at the time of the application with "affidavits or other evidentiary materials." Robertson, 2004 VT 15, ¶ 15; V.R.C.P. 56(c). For example, he has not taken the straightforward step of filing a sworn affidavit attesting to the absence of any buildings on Lot 3 at the time of his application or cited to any evidence in the record supporting such an absence. Nor has he successfully shown that Neighbor's cited materials do not establish the absence of a genuine dispute or that Neighbor cannot produce admissible evidence to establish the absence of a genuine dispute. *See* V.R.C.P. 56(c). In this regard, we note that Applicant is wrong as to the relevance of the DEC project review sheet and his own cover letter. As core parts of the

subdivision application that is the very subject of this de novo review, those are clearly relevant pieces of evidence.[4]

Given the lack of a genuine dispute that buildings were present on Lot 3 at the time of application, Applicant was required to depict those buildings on a map included with his application.[5]  This is true regardless of whether Applicant was proposing to defer further development on Lot 3.  *See* Subdivision Regulations § 3.02(B)(1).  In the absence of this information, the application is incomplete.  We therefore **GRANT** Neighbor's motion and **DENY** Applicant's motion for summary judgment on this issue.  On this basis, we affirm the DRB's denial of the application.  For the sake of completeness, we proceed to consider the remaining issues in the cross motions for summary judgment.

> B.      *Whether the application must be denied because it does not show the location and size of any existing sewers, water mains, and wells?*

The same provision that requires a subdivision application to include a map showing existing buildings also requires the map to show the "location and size of any existing sewers and water mains, individual or community sewage disposal systems, wells, culverts and drains on the property."  Subdivision Regulations § 3.02(B)(1)(c).  The regulations repeat this requirement for wells or onsite wastewater systems at § 4.03(B), although it is less clear whether that provision applies only to existing wells, or also to proposed wells.  The DRB cited these two provisions as further bases for denying the application and Neighbor argues we must affirm.

Neighbor claims that the undisputed material facts establish that Applicant had at least started to construct a water well on Lot 3 at the time of the application and that because no such well is shown on the final plat, the application must be denied as incomplete.  As a starting point we note that, unlike the buildings on Lot 3, neither the DEC project review sheet nor Applicant's subdivision application reference the existence of a well.  As evidence for this well's existence, Neighbor cites the DRB chair's presentation to the July 2020 DRB hearing, which referenced such

---

[4] We do not opine here on whether the DEC project review sheet would be admissible at trial on this basis, or whether it would require testimony by one with firsthand knowledge of its preparation to be admissible.

[5] Although Applicant tries to raise doubt as to whether the regulations specify how exactly to portray structures on a map, his engineer clearly knew how to do so: the plat depicted existing structures on Lots 1 and 2 with rectangles and labels.  *See* Subdivision Application at 4, "Subdivision Plat."  A complete application would have done the same for existing structures on Lot 3.

a well, and his counsel's photographs taken in June 2021. Neighbor's Statement of Undisputed Material Facts ¶¶ 12, 15. We conclude that this evidence, portions of which may be inadmissible, does not establish the existence of the well beyond dispute. We therefore **DENY** Neighbor's motion for summary judgment on this issue. However, we also note that Applicant has not put forward any evidence that would suggest no such well existed at the time of his application; we therefore must **DENY** his cross motion for summary judgment on this issue as well. We wish to be clear that if there is an existing well, sewer, or water main, it must be shown on any resubmitted application.

> C.     *Whether the application must be denied because no wastewater disposal system or on-site water supply are proposed—or if proposed are not depicted—for Lot 3?*

Neighbor makes several related arguments concerning the lack of a proposed water supply or wastewater disposal system for Lot 3. We treat those arguments together.

The Subdivision Regulations, § 4.03(B), require "new lots proposed for any purpose other than agriculture, forestry, recreation or conservation" to "demonstrate a location for wastewater disposal (sewer hookup on on-site), water supply, [and] other utilities . . . ." Applicant has not indicated such locations for Lot 3 on any of his maps, and Neighbor argues this is a basis to deny the application. However, § 4.03(E) states that the DRB "may defer requirements of these regulations" if a new lot "is intended for agricultural, forestry, or conservation purposes, or is greater than ten (10) acres in size and will not be developed at the time of subdivision approval." We interpret the reference in § 4.03(E) to "these regulations" to refer exclusively to the standards contained in Section 4.03, which are intended to ensure that each lot created through a subdivision has some prospective use. *See* Id. § 4.03(A). In his application, Applicant requested that the DRB consider his proposal as one to defer development on Lot 3, which is larger than 10 acres. He therefore argues that the requirements of § 4.03(B) should not apply to Lot 3. In turn, Neighbor argues that because structures already exist on Lot 3, the lot must be considered "developed at the time of subdivision approval" and so is not exempt from Section 4.03's requirements.

9

This is essentially a dispute over the meaning of the phrase "will not be developed at the time of subdivision approval." This dispute raises two legal issues: first, the meaning of the word "developed," which is not defined under the Subdivision Regulations, and second, whether § 4.03(E) allows the DRB to defer the requirements of Section 4.03 for a lot on which some development has already taken place, if no new development is proposed. However, we consider it unnecessary to resolve those issues here for several reasons. First, we have already denied the application based on the failure to portray existing structures on the plat, making resolution of these issues unnecessary for disposition of the case. *See, e.g.,* In re: Smith 2-Lot Subdivision (Appeal of Riley), No. 247-11-05 Vtec, slip op. at 6 (Vt. Envtl. Ct. Feb. 9, 2007) (Durkin, J.) (declining to resolve the issue of whether a lot had been "gerrymandered" under a town's regulations where the Court had already found the lot did not otherwise comply with the regulations).

Second, the language of § 4.03(E) is permissive—it says the DRB "may" defer the requirements for parcels that will not be developed, but it does not require the DRB to do so. Sitting in the DRB's shoes in this de novo review, we would therefore also have discretion to defer the requirements, assuming § 4.03(E) allowed us to do so. Rather than exercise this discretion here on an issue of first impression, we consider it more appropriate to allow the DRB to interpret the meaning of this provision with greater specificity and clarity should Applicant re-apply for this subdivision. *Cf.* In Re Wright & Boester CU Appl'n, 2021 VT 80, ¶ 24 (indicating that remand is appropriate to allow the lower tribunal to weigh in on a "statutory interpretation issue of first impression."). Finally, there remain unresolved factual issues about the extent of any existing and future developments, making summary judgment inappropriate. We therefore **DENY** summary judgment to both parties on this issue of whether the application must meet the requirements of § 4.03(B).

Neighbor's next related argument concerns § 4.05(D). This provision requires an applicant to show the location of any proposed wastewater treatment system or hookup for each parcel, or to "clearly identify the parcel as not having an approved wastewater site." Applicant's plat neither shows the location of a proposed wastewater treatment system *for* Lot 3 nor indicates that applicant proposes a use for Lot 3 that does not require a wastewater system. The plat does show, however, the proposed location of a wastewater system *on* Lot 3 that would

serve Lots 1 and 2. The language of the regulations is sufficiently ambiguous that Applicant might have mistakenly believed this was sufficient to comply with § 4.05(D). We are mindful that "because zoning ordinances are in derogation of private property rights, they must be construed narrowly in favor of the property owner . . . and any ambiguity is resolved in favor of the landowner." In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 29, 199 Vt. 19 (internal citations omitted). We therefore consider Applicant's failure to include a statement on the plat that Lot 3 was not proposed for a use requiring a wastewater system as, at most, harmless error. In the future, however, Applicant should indicate on the map for each lot either the proposed location of a wastewater system serving that lot, or indicate that the lot has not been approved with a wastewater site.

Lastly, § 4.04(C) requires an applicant to "provide evidence of the location of all proposed wells and evidence that these locations will meet applicable State regulations." Regardless of the applicability of § 4.03, Neighbor appears to argue that a well is proposed for Lot 3—the same well that Neighbor argues already exists. Because we have already concluded that § 4.03(E) may exempt lots eligible for deferred status only from the requirements of Section 4.03, we further conclude that § 4.04(C) is applicable to Lot 3, even assuming that lot is eligible for deferral of the requirements of Section 4.03. Because Neighbor's evidence for this point, however, is the same as we found insufficient to establish the presence of a well, Neighbor has not established the lack of a genuine dispute as to whether Applicant is proposing to build a well on Lot 3. Summary judgment for either party on this issue is therefore inappropriate. We remind Applicant that all proposed development, including wells, should be shown on a subdivision application, and that developing a lot in a manner that diverges from what is depicted on an approved final subdivision plan is a violation under the Subdivision regulations. *See* Subdivision Regulations § 3.02(E).

> D.      *Whether the application fails to ensure access for emergency vehicles on stretches of road with grades of more than 10% and so must be denied?*

Regulations § 4.07(B) requires any proposed private roads and driveways serving a subdivision to not exceed a maximum grade of 10% at any point. If they do, the DRB "shall require . . . measures to ensure access for emergency vehicles." § 4.07(B)(4)(a). The DRB cited this provision as one the application did not meet, and Neighbor argues that this is a ground for

denying the application. Neighbor has not pointed to any evidence in the record to establish that Applicant's proposal includes stretches of road or driveway with a grade of more than 10%. It is impossible to tell simply by looking at the grading plan whether such stretches of road exist; however, we note that the grading plan indicates one area will be re-graded to fall below the 10% maximum. Neighbor's Exhibit 1 at 7, "Grading Plan." In light of this lack of clarity, we conclude that we must **DENY** summary judgment to both parties on this issue.

> E. *Whether the application must be denied for a failure to include proposed utilities on the site plan or to include an abutting landowner in a road maintenance agreement?*

Neighbor also raises two further grounds within his third argument for why the application must be denied: Applicant's failure to include all proposed utilities in the maps accompanying the application and his failure to include Neighbor as a party to a proposed road maintenance agreement for Gallup Brook Lane. The DRB did not include these among its reasons for denying the application. *See* In re Permit No. SD-2020-02, Decision and Conditions (July 24, 2020). Our de novo review is "limited to consideration of the matters properly warned as before the local board." In re Maple Tree Place, 156 Vt. 494, 500 (1991). It is true that the DRB need not actually decide an issue for us to review it, so long as the DRB could have properly decided that issue and interested people had a chance to speak on it. Id.; *see also* In re Irish Const. Appl., No. 44-3-08 Vtec, Slip op. at 11–12 (Vt. Envtl. Ct., April 6, 2009) (Durkin, J.) ("In short, within the context of the pending application, we can do whatever the municipal panel 'might' have done at a [properly warned] hearing . . . but we can do no more." (citing In re Torres, 154 Vt. 233, 235–36 (1990)). We decline to complete these analyses here, however, as doing so is not necessary to resolve the present matter.

> F. *Whether the application must be denied because Lot 3 does not meet the requirements for deferral of development?*

Lastly, Neighbor argues we should affirm the DRB's finding that "existing and apparent ongoing improvements on Lot 3" demonstrate that the proposed use of the lot is not "deferred development" as Applicant indicated in his application, and that the application must therefore be denied. *See* In re Permit No. SD-2020-02, Decision and Conditions ¶ 4 (July 24, 2020). As

explained above, we decline to resolve this issue here, given that it involves statutory interpretation questions of first impression and given the presence of genuine disputes of fact. *See supra* Section II.C. We therefore **DENY** summary judgment to both parties on this issue.

## Conclusion

Neighbor has sufficiently demonstrated that buildings existed on Lot 3 at the time Applicant submitted this subdivision application. Because the applicable regulations clearly required such buildings to be shown on the application, which they were not, we conclude that the application must be denied. We therefore **GRANT** Neighbor's motion and **DENY** Applicant's motion for summary judgment on this issue. On this basis, we affirm the DRB's denial of the application. Applicant should not read our denial of summary judgment to both parties on Neighbor's remaining claimed grounds for denial as an affirmative finding that his application is sufficient in those areas.

A Judgment Order is issued concurrently with this decision. This concludes the matter before the Court.

Electronically Signed: 3/9/2022 12:49 PM pursuant to V.R.E.F. 9(d).

Thomas G. Walsh, Judge
Superior Court, Environmental Division

13